IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KENT ARETT,

            Plaintiff,

    v.

GARDENS ALIVE FARMS LLC
(LM FARMS, LLC) et al.,

            Defendants.

:

:

:

:

Case No. 3:19-cv-348

JUDGE WALTER H. RICE

---

AMENDED (to include missing page 8) DECISION AND ENTRY
SUSTAINING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (DOC. #23); JUDGMENT TO ENTER IN FAVOR OF
DEFENDANTS AND AGAINST PLAINTIFF; TERMINATION ENTRY

---

This matter is before the Court pursuant to a Motion for Summary

Judgment, Doc. 23, filed by Defendants, Gardens Alive Farms, LLC, Gardens Alive,

Inc., and Rostam Direct, LLC ("Defendants" or "Gardens Alive"). Plaintiff, Kent

Arett ("Plaintiff" or "Arett"), a former employee who alleges he was unlawfully

terminated from Gardens Alive in December 2018, and is also owed a bonus, has

filed a memorandum in opposition, Doc. #30, and Defendants have filed a reply,

Doc. #33. For the reasons set forth below, the Court sustains Defendants' Motion

for Summary Judgment.

I.     **Background Facts**

Gardens Alive is a direct marketing company that primarily sells

horticultural products. Doc. #20, PageID#126; Doc.#27-4.  In December 2013 or

January 2014, Arett spoke with Eric Hamant ("Hamant"), the then president and

chief executive officer ("CEO") of Gardens Alive, about a position with the

company. Doc. #20, PageID#118.   Although employed and not actively looking for

a new job, Plaintiff was interested in a position where he could make more money

so that he could retire comfortably.  *Id.*, PageID#119.  Because Gardens Alive had

no position available for him at the time of the interview, Hamant created the

position of Manager, Strategic Needs Analysis.  *Id.*, PageID##123-124; 154.  On

January 12, 2014, Arett received a letter, signed by Hamant, offering him this

position at a salary of $125,000.00.  The letter also explained his benefits and

bonus opportunity.  Doc. #27, PageID##894-895.  Concerning his bonus eligibility,

the letter stated he would be able to "participate in our annual Senior

Management Incentive Plan" for 2014, with a bonus payable after the 2015 year-

end audit.  *Id.*  On January 12, 2014, Arett signed the letter stating that he

"accepted[ed] the offer of employment . . . as outlined in this letter."  *Id.*   At the

time he was hired by Gardens Alive in January 2014, Arett was 70 years old. Doc.

#20, PageID#124. He had worked for over 40 years prior to joining Gardens Alive

"improving his employer's bottom line through streamlining production,

improving sales, and/or improving operational efficiencies." Doc. #30,

PageID#1601-1602.  His work included "turning around Sears Catalog in the late

1980s to early 1990s," making Danmark International profitable and increasing sales for The Popcorn Factory and improving its "'EBITDA' [which is Earnings Before Interest, Taxes, Depreciation, and Amortization] from negative 3.25% to positive 11.7%." *Id.* In general, "he oversaw operations for companies generating billions and billions of dollars in annual sales." *Id.*

In December 2017, Arett was running the company's Fairfield, Ohio, operations and was "working 12-hour days, six days a week." *Id.*, PageID##133-134. Because of this and other reasons, he discussed with Hamant the possibility of starting a "phased retirement" or working "three-quarter time." *Id.* The parties negotiated concerning the amount of hours Plaintiff would work and an opportunity for a bonus. *Id.*, PageID##135-139. Arett was told that this "phased retirement" and "three quarter time" would work, "as long as he was making a contribution. *Id.*, PageID#134.

On Friday, January 26, 2018, at approximately 4:00 p.m., Felix Cooper ("Cooper"), Defendants' then Vice-President of Horticulture and in early 2020 the President and Chief Operating Officer ("COO"), sent Plaintiff an email with a subject line stating "Comp and projects." Doc. #28-1, PageID#1164; Doc. #28, PageID#923. Included as a separate attachment to the email was a letter addressed to Arett, signed by Cooper and dated January 26, 2018. The attached letter from Cooper stated that it would "serve to confirm our conversation and set out the revised employment details." *Id.* PageID##1163. Specifically, it stated that Gardens Alive agreed to Plaintiff's request for a "reduced schedule," that the

3

"focus" of his role "going forward" would be "specific to special projects," and

that he would be paid $104,832.00 and eligible for all "voluntary benefits, paid

vacation as well as the Gardens Alive 401k Plan and the employer match." *Id.*

Arett would report to Cooper and would have no direct reports. *Id.* Cooper's

January 26, 2018, letter also stated that Plaintiff's "current bonus structure" would

be replaced with a "variable bonus."

> (3) Your current bonus structure will be replaced with a variable
> bonus based on agreed upon results and deadlines; details of which
> will be provided under separate cover.

*Id.*

The January 26, 2018, letter concluded by stating that the "offer is in effect

for five business days" and that Plaintiff should "please sign below" if he is "in

agreement with the above outline." *Id.* Plaintiff understood that Gardens Alive

had created this new position for him and that he was an at-will employee. Doc.

#20, PageID##132 and 154.

In the first paragraph of the email, Cooper described his January 26, 2018,

letter to Arett as "an adjusted offer letter for moving forward" and hoped it would

be agreeable" to him. In the email's second paragraph, Cooper stated the

following:

> I've framed the project list we have been discussing below. As
> discussed on Wednesday[,] I will look to you for an initial proposal on
> what the key metrics would be for calculating out the cost savings
> realized directly from these project elements. I am agreeable to a
> 10% bonus level calculated on the first[-]year savings x 3. The
> 'savings' in this case would need to be annualized[,] cap ex
> depreciation and your comp for the period until the project is

4

complete, [and] subtracted prior to calculating the bonus. I am
confident the two of us can work out in good faith exactly how that
calculation will be made so that it ties in to the specific project impact
vs[.] other variables.

Doc. #28-1, PageID#1164. The email ended with a "Project list" listing six

different projects. *Id.*

Arett understood from the January 26, 2018, email that a bonus would be

calculated as follows: three times ten percent of the savings with the capital

expenditure and his compensation for the period that he worked on the project

subtracted from that amount. Doc. #20, PageID##145-146. He was not sure what

Cooper meant when he said in the January 26, 2018, email that he was "confident

the two of us can work out in good faith exactly how that calculation will be made

so that it ties to the specific project impact versus other variables." *Id.*,

PageID#148. This is because Plaintiff believed that this language in the email

stated "how we're going to calculate it." *Id.* Despite this uncertainty, he does not

remember any further discussion with Cooper about the bonus calculation until

after November or December 2018, when he learned from Cooper that he was

being terminated from Gardens Alive. *Id.*, PageID#145. Additionally, although the

January 26, 2018, email stated that Cooper "would look to" Plaintiff "for an initial

proposal on what the key metrics would be for calculating out the cost savings

realized directly from these project elements," he never provided this "initial

proposal" to Cooper. Doc. #28-1, PageID#1164. He believed that "[I]t was strictly

a calculation" of what the cost was in any given year, that it was "fairly

5

straightforward" and that there are company accounting systems that can determine it.  Doc. #20, PageID#144.

On Monday, January 29, 2018, at approximately, 9:30 a.m., Arett sent an email to Cooper's January 26, 2018, email stating "I agree."  Doc. #29-1, PageID#1470.  On February 7, 2018, Copper sent an email to Arett requesting that he "send on the signed [January 26, 2018,] letter. . . so I can get the final paperwork processed." *Id.*  Plaintiff does not remember if he ever signed the January 26, 2018, letter from Cooper.  Doc. #20, PageID#142.

Sometime in March or April 2018, Hamant, the CEO, came to Arett's office and asked him if he was ready to retire and if he had enough money to do so. *Id.*, PageID#152.  Plaintiff responded that although he could "probably get by," he really needed to work a few more years. *Id.*  During this same time, Cooper also asked Plaintiff about his plans for retiring.  *Id.*, PageID#155. Although Hamant and Plaintiff had previously discussed his desire to replenish his retirement funds, he never had these discussions with Cooper.

In 2018, Plaintiff, along with seven other individuals who were in their thirties and forties, reported directly to Cooper as a "direct report." Doc. #28, PageID##931, 933 and 942.  Although Plaintiff was "focused around looking for ways to optimize Gardens Alive's processes," the other seven direct reports were also expected to "optimize processes" as part of their job. *Id.*  Although an effort is made to give everyone at Gardens Alive a written performance evaluation on an annual basis, and Cooper tries to do so with his direct reports, he gave no written

evaluation or informal review to Plaintiff in 2018. Doc. #28, PageID##943 and 937.

Cooper also had no discussion with him about being on a "career track" with

Gardens Alive.  *Id.*  A career track is a topic in a discussion that Cooper has with

an employee concerning how the employee "might be able to grow in the

organization, what kind of opportunities they might have" and to plan "out a little

beyond the one-year review cycle period."  *Id.* PageID#934.  Cooper had such a

discussion with Jeremy Close, a project manager in his forties.  *Id.*, PageID##925-

927.  However, he had no such discussion concerning a career track with another

employee, Chris Eifert, an employee in his mid-70's who was hired in 2019.

Cooper, however, has discussed with Eifert his interests and aspirations in his

work for the company. *Id.*, PageID#934.

In late October or early November 2018, Plaintiff found out he was being

terminated when he was handed a letter from Cooper.  Doc. #20, PageID##149-

150. He has no knowledge whether anyone was hired to replace him or if his

position was eliminated. *Id.*, PageID##153-155.

Although Plaintiff stated that Cooper merely handed him a letter advising

him of his termination, Cooper testified that he told Arett, at the time of his

termination, that the company was under financial pressure with the bank and

had to close completely the LM Farms division, a "big division" of Gardens Alive.

Doc. #28, PageID##968 and 970.  Although in "a cost-cutting mode," Cooper did

not recall any "across-the-board job eliminations" in 2018 or the first quarter of

2019, and did not recall letting anybody else go in that time frame besides

Plaintiff. *Id.*, PageID#970. According to Cooper, an additional factor, although not shared with Plaintiff at the time of his termination, was his delay in completing projects and the "deterioration" of "positive interactions with colleagues." *Id.*, PageID#980.

After Plaintiff was told he was terminated, he tried unsuccessfully to talk to Cooper to "go through how" to "calculate" his bonus since "it was time to start thinking" about it. Doc. #20, PageID#144. Although he wanted to have that conversation with Cooper "so we could go through how to calculate it, . . . the calculations are really based on" Defendants' "accounting systems." *Id.* On December 19, 2018, Gardens Alive offered Plaintiff $12,080.97 to "resolve matters [and] to get Kent some money at the end of his employment." Doc. #27-12, PageID#914; Doc.#28, PageID#1081. In making this offer, Cooper tried to address some of the components referred to in the January 26, 2018, email. *Id.* PageID#1064. Arett rejected the $12,080.97 offer. He has calculated a bonus due him of approximately $513,430.64. Doc. #27-13, PageID#915.

Following his termination, Arett filed a complaint of age discrimination with the Equal Employment Opportunity Commission ("EEOC"). Doc. #1, PageID#3. On August 7, 2019, he received a notice of dismissal of his complaint and notice of right to sue. Doc. #1-1. Suit was filed November 5, 2019. The Complaint alleges four counts: Count I, age discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*; Count II, age discrimination and retaliation in violation of Ohio Revised Code Chapter 4112;

8

Count III, breach of contract and promissory estoppel; and Count IV, unjust enrichment.

## II.    **Summary Judgment Standard**

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a

9

scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the Court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Legal Analysis

### A. Age Discrimination Claims Under the ADEA and Ohio Rev. Code § 4112 (Counts I and II)[1]

The ADEA makes it unlawful for an employer "to . . . discharge any

individual or otherwise discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such

individual's age." 29 U.S.C. § 623(a).[2]  A plaintiff can show age discrimination by

either direct evidence or circumstantial evidence.  Because there is no direct

evidence of age discrimination,[3] Arett's claim must be evaluated using

---

[1] Although the captions of Counts I and II in the Complaint also reference claims of retaliation under the ADEA and Ohio Rev. Code § 4112, no facts are alleged in the Complaint concerning this claim.  Additionally, Plaintiff makes no argument in support of retaliation under the ADEA or Ohio Rev. Code § 4112 in his Response to Defendants' Motion for Summary Judgment, Doc. #30.  Accordingly, the Court deems this theory of liability abandoned by Plaintiff.  *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011)) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment).

[2] Because claims under the ADEA and Ohio law may be analyzed together, Plaintiff's age discrimination claims under Ohio Rev. Code § 4112 will be analyzed utilizing federal case law. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 469 (6th Cir. 2002) ("In analyzing claims arising under Ohio Rev Code § 4112, Ohio courts have adopted the framework established in federal case law concerning Title VII and the Age Discrimination in Employment [A]ct"). *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Com'n*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981).

[3] Plaintiff's Response, Doc. #30, does not argue that direct evidence of age discrimination exists. Arett, however, testified that several months before he was terminated, Hamant and Cooper questioned him about when he was going to retire and whether he had enough money to retire. Because these questions do not prove discrimination without requiring inferences, they are not direct evidence of age discrimination. *Lee v. Cleveland Clinic Foundation*, 676 Fed. Appx. 488, 493-494 (6th Cir. 2017) (questions to an employee as to when she would retire are not direct evidence of age discrimination because "they

11

circumstantial and indirect evidence and the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089 (1981). *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (internal citations omitted) ("The *McDonnell Douglas/Burdine* formula is the evidentiary formula applicable not only to claims brought under Title VII, but also [to] claims under the ADEA . . .").

Under the *McDonnell Douglas-Burdine* analysis, a plaintiff must first set forth a *prima facie* case of discrimination using circumstantial evidence.  If the plaintiff sets forth the elements of a *prima facie* case, the burden of production shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. *Id.* If the employer satisfies this burden of production, the plaintiff must then prove, by a preponderance of the evidence, that the reasons offered by the employer were a pretext for discrimination. *Id.* The ultimate burden of persuasion of discrimination remains at all times with the plaintiff. *Burdine at* 253

To establish a *prima facie* claim of age discrimination under the ADEA, Arett must show the following: "(1) he is a member of a protected group[;] (2) he was qualified for the position in question[;] (3) his employer took an adverse employment action against him[;] and (4) there are 'circumstances that support an

_____

require . . . us to *infer* that she asked Plaintiff about her retirement because she wanted to pressure [her] to retire and was motivated to do so on account of [her] age."(emphasis added)).

12

inference of discrimination.'" *Willard v. Huntington*, 952 F.3d 795, 808 (6th Cir.

2020) (citing *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012),

(quotation omitted).  As to the fourth element, the Sixth Circuit has held that

"such circumstances supporting an inference of discrimination" include whether a

plaintiff was replaced with a younger employee or if the employer "treated

similarly situated, non-protected employees more favorably." *Willard,* 952 F.3d at

808 (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521–22 (6th Cir. 2008).

The plaintiff's burden to establish a *prima facie* case is light, one "easily met" and

"not onerous." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)

(quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir.2000).

Here, Defendants do not challenge that Arett is a member of a protected

group, was qualified for his position and that his termination was an adverse

employment action.  Instead, they argue that no *prima facie* case of age

discrimination exists since Plaintiff cannot show that he was replaced with a

younger employee. *Id.*; Doc. #23, PageID#636.  In response, Plaintiff asserts that a

*prima facie* case of age discrimination exists since Defendants have hired

"multiple people to the administration team" reporting, as Plaintiff did, to Cooper,

that all of these people are younger than Plaintiff by thirty or forty years and that

all of them perform his essential duty, to wit: "to optimize processes." Doc. #30,

PageID#1617.  This argument, however, is not supported by the evidence.

Although Cooper's direct reports were considerably younger than Plaintiff,

these direct reports, even before Plaintiff was terminated, also had the

responsibility of "optimizing processes" as part of their job responsibilities.
Accordingly, they did not "replace" Plaintiff and his "essential duty" of
optimization of processes" at Gardens Alive. A person is "replaced only when
another employee is hired or reassigned to perform the plaintiff's duties."
Replacement does not occur when one employee is assigned to perform the
terminated or demoted employee's duties in addition to other duties, or when the
work is redistributed among other existing employees already performing related
work. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (48-year
old's ten-month assumption of duties that were previously performed by a 54-
year old plaintiff who was demoted to non-supervisory position is not
replacement under the ADEA) (quotation omitted). Moreover, Plaintiff's argument
of age discrimination and replacement by "multiple [younger] people" ignores the
language in Cooper's January 26, 2018, letter to him stating that Defendants
created a position for him to accommodate his desire for a "phased retirement"
with reduced hours. Plaintiff has not shown that Gardens Alive hired anyone to
replace him for this specially created position.[4]

Nor has Plaintiff shown that Defendants "treated similarly situated, non-
protected employees more favorably" than he was treated. *Willard*, 952 F.3d at
808. While at least one younger employee, Jeremy Close, was on a career track

___

[4] Although Chris Eifert was a new hire in 2019, there is no evidence that he was a
replacement for Plaintiff. As the Director of Operations, Eifert, who is also in his 70's,
oversaw the fulfillment activities, production activities, distribution center facilities and
the "IT division" of the company. Doc. #28, PageID#925.

14

and Plaintiff was not, Plaintiff chose to opt out of a career track by requesting

reduced hours and to start a "phased retirement." Although he did not receive an

evaluation from Cooper, these are given annually and Arett had worked for

Cooper as a direct report for less than one year before he was terminated.

Accordingly, Plaintiff has not shown that any employee who was similarly

situated" and "non-protected" was treated more favorably.

Because Plaintiff cannot show that "there are 'circumstances that support

an inference of discrimination,'" *Willard*, 952 F.3d at 808, the fourth element of a

*prima facie* case of age discrimination under the ADEA, there is no genuine issue

of material fact and Defendants are entitled to judgment as a matter of law on

Plaintiff's claims of age discrimination in Counts I and II.

### B. Breach of Contract/Promissory Estoppel, Count III

Count III of the Complaint alleges a claim for breach of contract as a result

of Defendants' refusal to pay Arett a bonus "for his work after January 26, 2018."

Doc. #1, PageID#6. As an alternative to this claim, Plaintiff alleges a claim of

promissory estoppel. *Id.* The Court will first address Plaintiff's breach of contract

claim followed by his claim of promissory estoppel.

#### 1. Breach of Contract

To establish a claim for breach of contract, Arett must show that there was

a binding contract or agreement, that he performed his contractual obligations and

that he suffered damages due to Defendants' breach of that contract or agreement.

*Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, 152 Ohio St. 3d 453,469, 97

N.E.3d 458 (Ohio 2018).  Whether a binding contract or agreement exists is a

question of law, *Latina v. Woodpath Development Co.,* 57 Ohio St.3d 212, 214, 567

N.E.2d 262 (1991); *Stock Yards v. Hillsboro*, 191 Ohio App.3d 564, 569 at ¶ 10, 947

N.E.2d 183, 186 (Ohio Ct. App. 2010), and the party asserting the existence of a

contract has the burden of proof. *Guardian Alarm Co. v. Portentoso*, 196 Ohio

App.3d 313, 963 N.E.2d 225, 230 (2011) (citing *Lynd v. Sandy & Beaver Val. Farmers*

*Mut. Ins. Co.*, 103 Ohio App. 408, 411, 145 N.E.2d 453, 455 (1957) (insured seeking

coverage under insurance contract has the burden of establishing the existence of

the contract).

Plaintiff's Response asserts that the January 26, 2018, email he received

from Cooper, and his reply email to him on Monday morning, January 29, 2018,

stating "I accept," created a bonus contract for his work after January 26, 2018.

He relies on the following language from the email:

> I've framed the project list we have been discussing below.  As
> discussed on Wednesday[,] I will look to you for an initial proposal on
> what the key metrics would be for calculating out the cost savings
> realized directly from these project elements.  I am agreeable to a
> 10% bonus level calculated on the first[-]year savings x 3.  The
> 'savings' in this case would need to be annualized[,] cap ex
> depreciation and your comp for the period until the project is
> complete, [and] subtracted prior to calculating the bonus.  I am
> confident the two of us can work out in good faith exactly how that
> calculation will be made so that it ties in to the specific project impact
> vs[.] other variables.

Doc. #28-1, PageID#1164.

Although Arett admits he never provided Cooper with an "initial proposal"

on the "key metrics . . . for "calculating out the cost savings realized directly from

these project elements," he argues that this was "of no consequence." This is so,

he asserts in his Response, because Cooper "took that all away when he

immediately thereafter spelled out the specifics of the metrics he would agree to:"

> I am agreeable to a 10% bonus level calculated on the first[-]year
> savings x3. The "savings" in this case would need to have the
> annualized cap ex depreciation and your comp for the period until the
> project is complete, subtracted prior to calculating the bonus.

Doc. #30, PageID#1611.

Accordingly, he contends the "estimated savings" was the only thing to

"plug into" this "agreed-upon formula"and Cooper "promised to work out how

that calculation would be made on a project to project basis" by stating that "'the

two of us can work out in good faith exactly how that calculation will be made so

that it ties into specific project impact . . .'" *Id*. Plaintiff argues in his Response

that by using Defendants' information of the reduced labor costs for the smaller

projects and its records that are used to estimate the savings for the larger

projects, calculation of the savings is "relatively easy."

In its Motion for Summary Judgment, Gardens Alive also cites to the

above-referenced language from Cooper's January 26, 2018, email. It argues,

however, that this language shows that no contract for a potential bonus was ever

created. It contends that because Plaintiff never provided Defendants with an

"initial proposal" addressing the "key metrics" of the "cost savings" that were

"realized directly from these project elements," no "meeting of the minds" occurred as to how to calculate the bonus.  It asserts the non-existence of a bonus contract as a result of Plaintiff's failure to provide the requested "initial proposal" is evident in Plaintiff's unreasonable demand: an entitlement to a bonus of $535,000, nearly five times his base salary.  Defendants argue that Plaintiff is entitled to no bonus because he actually lost money for them.

Concerning the January 26, 2018, email, the parties agree that it states Plaintiff was to provide "the initial proposal" identifying "the key metrics . . . for calculating . . . the cost savings realized directly from these project elements." They also both agree that he failed to provide this proposal to Cooper. Plaintiff dismisses his failure as being "of no consequence," because Cooper proposed an "agreed upon formula" in the next sentence that "spelled out the specifics of the metrics."  A review of this sentence and the remainder of the email, however, demonstrates that Plaintiff's argument is without merit.

Although Cooper states in the second sentence of the email that he is "agreeable to a 10% bonus level calculated" on three times the "first[-]year savings," with the "'savings' to be  "annualized" with  depreciation and Plaintiff's salary for the period subtracted before the bonus calculation, these terms do not negate the need for an "initial proposal" and do not provide any "metrics." Instead, this sentence indicates *how* the bonus can be calculated once the "key metrics for calculating out the cost savings realized *directly* from these project

18

elements" are agreed upon. (emphasis added).  Additional evidence that there
was no "agreed upon formula" is found in the final sentence of the email.

> I am confident the two of us can work out in good faith exactly how
> that calculation will be made so that it *ties into the specific* project
> impact *[as opposed to] other variables*. (emphasis added).

Doc. #30, PageID#1611.

In this last sentence, Cooper states his intent to "work out in good faith" with
Plaintiff how the "calculation," which requires identification of the "key metrics,"
is made so that it "ties in to the specific project" versus "other variables."
Accordingly, the above quoted sentence shows Cooper's intent to further define
the "key metrics for calculating out the cost savings" that are to be identified in
Arett's "initial proposal" to Cooper.

"In order to declare the existence of a contract, both parties to the contract
must consent to its terms; there must be a meeting of the minds of both parties;
and the contract must be definite and certain." *Episcopal Retirement Homes, Inc.
v. Ohio Dept. of Indus. Relations* (1991), 61 Ohio St.3d 366, 369, 575 N.E.2d 134
(citations omitted.) The essential terms in a contract "include an offer, acceptance,
contractual capacity, consideration (the bargained for legal benefit and/or
detriment), a manifestation of mutual assent and legality of object and of
consideration." *Kostelnik v. Helper*, 96 Ohio St. 3d 1, 3, 770 N.E.2d 58 (2002)
(citation omitted).  These terms are considered "sufficiently certain if they 'provide
a basis for determining the existence of a breach and for giving an appropriate
remedy.'" *Knoop v. Orthopaedic Consultants of Cincinnati, Inc.,* 12th Dist.

Clermont No. CA2007-10-101, 2008-Ohio-3892, 2008 WL 2955393 (because essential term of providing a method of calculating the total price of plaintiff's initial visit was lacking in his "self-pay" document, court was unable to determine the basis of the alleged breach or for fashioning an appropriate remedy).

Here, the essential elements of how to calculate Plaintiff's bonus is absent, due to Plaintiff's failure to provide Cooper with the "initial proposal" identifying the "key metrics" used to calculate "the cost savings realized *directly* from these project elements"(emphasis added). By failing to provide any evidence as to how a cost savings "calculation will be made so that it *ties into the specific* project impact *[as opposed to] other variables*" (emphasis added), there is no offer and, thus no contract as a matter of law. Accordingly, although Plaintiff argues that the January 26, 2018, email was an offer to which he only needed to reply with an email stating "I accept," the essential terms of this alleged offer were not definite and certain and there was no meeting of the minds.[5]

Because the email is not an offer, it provides no basis for determining the existence of a breach and without any understanding of what the "the key metrics" are "for calculating . . . the cost savings realized *directly* from these project elements," (emphasis added), there is no basis for fashioning an appropriate remedy. *Reedy*, 143 Ohio App. 3d at 521; *First Natl. Bank of Omaha*,

---

[5] Plaintiff's reply of "I accept," allegedly in response to the January 26, 2018, email, is ambiguous since it arguably indicates acceptance of Cooper's requirement that he provide the "initial proposal" of the "key metrics" to calculate "out the cost savings realized directly from the project elements."

61 N.E. 3d at 762. If the Court had this information, it could arguably determine

that the parties intended to be bound, could fashion the less essential terms that

were omitted and reach a fair and just result. *Litsinger Sign Co. v. American Sign

Co.*, 11 Ohio St.2d 1, 227 N.E.2d 609 (Ohio 1967). Without the required "initial

proposal," however, "the parties' manifestations taken together as making up the

contract" and "reasonably interpreted in the light of all the circumstances, do not

enable the [C]ourt to determine what the agreement is and to enforce it without, in

effect, 'making a contract for the parties.'" *Id.* at 619.

Construing the evidence in favor of Plaintiff and considering the January 26,

2018, email in its entirety, the Court finds that there is no genuine issue of

material fact and that Defendants are entitled to judgment as a matter of law on

Plaintiff's claim of breach of contract.

### 2. Promissory Estoppel

As an alternative to his claim for breach of contract, Plaintiff argues the

quasi-contractual concept of promissory estoppel. "'The doctrine of promissory

estoppel comes into play where the requisites of contract are not met, yet the

promise should be enforced to avoid injustice.'" *Olympic Holding Co., L.L.C. v

ACE Ltd.*, 122 Ohio St.3d 89, 96, 909 N.E.2d 93,100 (citation omitted). Ohio has

adopted the rule of the Restatement of the Law, Contracts 2d (1973), Section 90:

> A promise which the promisor should reasonably expect to induce
> action or forbearance on the part of the promisee or a third person
> and which does induce such action or forbearance is binding if
> injustice can be avoided only by enforcement of the promise.

*Talley v. Teamsters Local No. 377* (1976), 48 Ohio St.2d 142, 146, 357 N.E.2d 44; *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 104, 483 N.E.2d 150, 154 (Ohio 1985).

Accordingly, to be successful on this claim, Plaintiff must show: (1) Gardens Alive made a promise clear and unambiguous in its terms; (2) he relied on this promise; (3) his reliance was reasonable and foreseeable; and (4) he was injured by his reliance. *Cohen & Co., CPAs v. Messina, CPA*, 24 Ohio App.3d 22, 26, 492 N.E.2d 867, 872 (Ohio App. 8 Dist.1985). Absent a clear and unambiguous promise, a claim for promissory estoppel does not exist.

The basis for Plaintiff's promissory estoppel claim is the January 26, 2018, email. This email, however, does not show a "clear and unambiguous promise" to pay Plaintiff a bonus. Instead, it is a framework for further negotiations. This is so since Cooper's January 26, 2018, letter to Arett states that his "current bonus structure will be replaced with a variable bonus based on agreed upon results and deadlines; details of which will be provided under separate cover." The email upon which Plaintiff relies, however, provides no "agreed upon results and deadlines" indicating that negotiations for the bonus were not concluded. Although Plaintiff argues that he relied on the January 26, 2018, email for his bonus and would never have agreed to work for the reduced salary without a bonus opportunity, because the email contains no clear and unambiguous promise and there is no evidence of any "agreed upon results and deadlines," Arett's reliance on the email was unreasonable as a matter of law. *Carcorp, Inc. v.*

22

*Chesrown Oldsmobile–GMC Truck, Inc.*, 10th Dist. No. 06AP–329, 2007–Ohio–380, 2007 WL 259248 at ¶ 20 (finding that "reliance on a statement of future intent made prior to the conclusion of negotiations in a complex business transaction is unreasonable as a matter of law" where the parties did not discuss, let alone agree upon, most of the necessary contract terms).

For the reasons set forth above, the Court finds that there is no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law on Plaintiff's claim of promissory estoppel.

### C. Unjust Enrichment, Count IV

In Count IV of the Complaint, Plaintiff alleges a claim, in the alternative, for unjust enrichment. A cause of action for unjust enrichment arises from a contract implied in law or quasi-contract. *Hummel v. Hummel*, 133 Ohio St. 520,525, 14 N.E.2d 923 (1938). To state a claim for unjust enrichment, Arett must show "(1) a benefit conferred by the plaintiff on the defendant, (2) knowledge of the benefit by the defendant, and (3) retention of the benefit by the defendant in circumstances where it would be unjust to do so." *Longmire v. Danaci*, 155 N.E. 2d 1014, 1024 (Ohio Ct. App. 2020) (citations omitted). Gardens Alive argues that no claim for unjust enrichment exists, since Plaintiff cannot show circumstances where it would be unjust or unconscionable for it to retain any benefit conferred upon it without payment. It asserts that Arett received substantial consideration, over $100,000, as a salary for "three-quarters time" and he failed to provide Cooper the

"initial proposal."   As a result, it was his own "inaction" that prevented any meeting of the minds with Defendants on a bonus payment.  Finally, Defendants argue that Plaintiff's argument that he is entitled to a bonus of over $500,000 for a 32-hour work week when he was paid less than a third of that the year before, working 60 hours a week, is unreasonable. In response, Arett asserts that Gardens Alive "kept him around by promising him a bonus – a potentially high one, given the 'millions' in company inefficiencies." Doc. #30, PageID#1617.  In support of this claim, he cites to *Quesnell v. Bank One Corp.* (Apr. 4, 2002), Franklin App. No. 01AP–792, 2002 WL 500506.  In *Quesnell*, the denial of an employee's unjust enrichment claim based on a defined and previously in place incentive plan was found by the court of appeals to be against the manifest weight of the evidence. As stated by the appellate court, plaintiff "had every reason to anticipate receiving incentive payments for her services as a relationship manager because payment was promised to her [and it was] unjust under these circumstances for Bank One to withhold payment." *Id.* at *22.  Here, however, as explained earlier in this Decision, no bonus contract was ever in existence.  Cooper's January 26, 2018, letter to Arett specifically stated that his current bonus would be "replaced with a variable bonus based on agreed upon results and deadlines, details of which will be provided under separate cover." Moreover, the January 26, 2018, email outlining the variable bonus plan required Plaintiff to provide an initial proposal which he failed to do.

24

Unjust enrichment is an equitable doctrine.  Accordingly, it is not enough for Arett to show that a benefit has been conferred upon Gardens Alive. He "'must go further and show that under the circumstances [he has] a superior equity'" making it "'unconscionable for the [Defendant] to retain the benefit.'" *United States Health Practices v. Blake*, 10th Dist. No. 00AP-1002 (Mar. 22, 2001), quoting *Katz v. Banning,* 84 Ohio App.3d 543, 552 (10th Dist.1992).  Here, no "superior equity" has been shown since Arett was paid his salary, failed to provide an initial proposal as required in the January 26, 2018, email and had no further discussion with Gardens Alive, despite not understanding the need for an initial proposal or why he and Cooper "would need to "work out in good faith" how "that calculation" would be made.  As such, to the extent a benefit was rendered over and above his salary, it was not "unconscionable for Defendant to retain the benefit." *Id*.

Accordingly, the Court finds that there is no genuine issue of material fact and Gardens Alive is entitled to judgment as a matter of law on Plaintiff's claim of unjust enrichment.

## IV.    Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment, Doc. #23, is SUSTAINED.

Judgment is to enter in favor of Defendants, Gardens Alive Farms, LLC, Gardens Alive, Inc., and Rostam Direct, LLC and against Plaintiff, Kent Arett.

The captioned cause is hereby ordered terminated upon the docket records
of the United States District Court for the Southern District of Ohio, Western
Division, at Dayton.


Date: September 10, 2021

WALTER H. RICE
UNITED STATES DISTRICT JUDGE